```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF ILLINOIS


UNITED STATES OF AMERICA,
                                        Docket No. 07-20025
          Plaintiff,

     vs.                                Urbana, Illinois
                                        October 1, 2007
JABARI VEALS,                           3:45 p.m.

          Defendant.



              JURY TRIAL -- DAY 1 of 3

     BEFORE THE HONORABLE MICHAEL P. McCUSKEY
          CHIEF UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For the Plaintiff:       COLIN S. BRUCE, ESQUIRE
                         Assistant United States Attorney
                         201 South Vine Street
                         Urbana, Illinois  61802
                         (217) 373-5875

For the Defendant:       JOHN C. TAYLOR, ESQUIRE
                         Assistant Federal Defender
                         300 West Main Street
                         Urbana, Illinois  61801
                         (217) 373-0666





Court Reporter:          LISA KNIGHT COSIMINI, RMR-CRR
                         U.S. District Court
                         201 South Vine, Suite 344
                         Urbana, Illinois  61802
                         (217) 384-2290

Proceedings recorded by mechanical stenography; transcript
produced by computer.
```

FILED
MAY - 5 2008
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

1
2                          I N D E X
3
4
5                                                           Page
6
7
8    OPENING STATEMENT By Mr. Bruce .......................... 39
9
10   OPENING STATEMENT By Mr. Taylor ......................... 48
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                (All previous proceedings were reported
 2           but not now transcribed.)
 3                (Jury present, 3:45 p.m.)
 4           THE COURT:  Mr. Bruce, on behalf of the United
 5   States of America, are you ready to address the jury?
 6           MR. BRUCE:  Yes, sir.
 7           THE COURT:  You may do so at this time.
 8           MR. BRUCE:  May it please the Court, Mr. Taylor.
 9           MR. TAYLOR:  Mr. Bruce.
10           THE COURT:  Mr. Bruce.
11           MR. BRUCE:  Mr. Zukosky.
12           Ladies and gentlemen, good afternoon.  Let me
13   reintroduce myself.  My name is Colin Bruce, and I'm an
14   assistant U.S. attorney.  You met Detective Root who was the
15   gentlemen sitting here briefly this morning whose dad had the
16   quintuple bypass surgery.  He's a detective with the Decatur
17   Police Department; and as the judge told you, he's the case
18   agent for the case.  Together, Detective Root and I represent
19   the United States of America.
20           Now, what is this case about?  This is actually a
21   very simple case.  It will be a short case, very simple.  This
22   case involves the defendant, Jabari Veals, possessing over 50
23   grams of cocaine base, or crack -- actually 56 grams -- with
24   the intent to distribute that.
25           Now, what do we expect the evidence to be?
```

1  You're going to hear this case began with a search warrant
2  being done on a house in Decatur -- actually, an apartment on
3  the second floor of this house.  This house was on Johns
4  Street in Decatur.  The search happened on January 9th of this
5  year about 7:30 p.m.
6           First, you're going to hear from Decatur Police
7  Officer Ed Hurst.  Ed Hurst is going to tell you that he is a
8  member of the Decatur Police Department's ERT team.  It's
9  called the Emergency Response Team, ERT team.  One of the jobs
10 of the ERT team is to help with search warrants.  They're the
11 first people in the door in search warrants on houses and
12 apartments, and they secure the area; and then other officers
13 come in and do the rest of the search.
14          He'll tell you that on January 9th of this year, at
15 about 7:30 p.m., he went with other members of the ERT team to
16 837 East Johns Street in Decatur. Now, as you might have seen
17 on TV, he's wearing the outfit -- he's got the vest on that
18 says "Police" on it.  He's got a jacket that says "Police" in
19 big neon letters.  All his gear's on with the rest of the
20 guys.
21          And they arrive at this house -- they arrive at
22 this house on Johns Street, 837.  Officer Hurst will tell you
23 he went around to the side of the house, this side over here
24 where my finger's pointing, the right-hand side as you're
25 looking at the picture.  That's where the door is that leads

1  to a staircase going up to the second-floor apartment.
2           He did what's called knocking and announcing. He
3  took a halogen tool, a big tool you can use to pry open the
4  door. And he banged on the door. "Police. Search warrant.
5  Open up. Police. Search warrant. Open, up," bang, bang.
6  He waits a little while. Standard procedure. No response
7  from inside the apartment upstairs. He steps aside.
8           Other members of the ERT people hit the door with
9  the ram. They go running upstairs. "Down, down, down.
10 Police. Search warrant. Down. Police. Search warrant.
11 Down, down, down."
12          Inside the apartment, they find three women, and
13 the house is secure without incident inside.
14          Outside was a different story. The next witness
15 you're going to hear from is Sergeant Rick McElroy of the
16 Decatur Police Department. He's going to tell you he was
17 outside the house with other officers doing perimeter, kind of
18 doing surveillance on the house, watching it to make sure
19 nobody tried to flee. And, sure enough, as he's watching,
20 he's in a position -- he's sort of -- as you look at this
21 picture, he's diagonally away from the house, the opposite
22 side where the door is, where the police knock.
23          He hears the bang -- bang, bang, "Police." He
24 hears Officer Hurst. And a few seconds later, he looks up and
25 he sees something amazing. The defendant is coming out this

1  second-story window. Now, we're not talking about climbing
2  out and hanging for a second dangling, waiting. The defendant
3  comes out and jumps straight down on that concrete patio right
4  there in front. And then he takes off running, seconds after
5  he hears that, "Police. Search warrant."
6        Rick McElroy and the other officers chase him.
7  "Stop. Police. Halt." They're all wearing their gear that
8  says, "Police," badges out, vests on. "Police. Stop, stop,
9  stop. Halt." He doesn't stop.
10       McElroy catches the defendant, grabs him, tries to
11 take him down. The defendant shakes him off, slams him into a
12 phone pole. McElroy falls down. But by then, other officers
13 have gotten there. They jump on him. They tackle him and
14 take him down; and, finally, he's taken into custody.
15       Next, you're going to hear from Detective Root.
16 Detective Root had a job at the search warrant also. His job
17 was to be the evidence custodian. So now that the area was
18 secured and the defendant was in custody, they went up and
19 conducted a search. First, he'll describe the apartment to
20 you. It's a small apartment. It's a one-bedroom apartment.
21 It has a single bedroom. It has one bathroom, a sort of
22 kitchen area, and then kind of a living room area. And in
23 that living room, there's a mattress. That's where the
24 defendant was staying. There's a mattress. There are some
25 shelving units on the wall.

He'll tell you he began to do a search of the apartment, and several items belonging to the defendant were found on the shelving unit: personal effects, toothbrush, razor -- there's some toothpaste over there. The defendant's Bible was found. He'll tell you when he opened up that Bible, he found some $2 bills that actually had the defendant's name written on them. I'm not sure what that's about. But that's his Bible.

And then they found this jar of hair gel. When they checked inside the jar of hair gel, they found 56 grams of crack inside a plastic bag. Now, within that plastic bag was 56 grams of crack that were bagged up in individual bags like for retail and distribution.

Later that night, Detective Root did a preliminary interview with the defendant. He advised him of his Miranda rights. "You have the right to remain silent," et cetera. The defendant waived those rights. He had a brief discussion.

But then you're going to learn that on February 2nd of 2007, there was a more detailed interview of the defendant, with both Detective Root and Special Agent Jeff Warren of the FBI. More on that interview in just a moment.

Finally, Detective Root, who qualifies as an expert on crack cocaine and crack distribution, drug trafficking, et cetera, he'll explain to you as an expert that, number one, you make crack cocaine by heating powder cocaine. You mix it

1  with baking soda and water and heat it up and stir it. That's
2  how you make crack. He'll explain that to you. He'll also
3  tell you that 56 grams of crack -- well, frankly, he'll tell
4  you that's -- 56 grams of crack is worth on the street about
5  $5,600; and that is not a personal use amount. That's a
6  distribution amount. No user is going to have $5,600 worth of
7  crack.
8         Now, after you -- Detective Root finishes
9  testifying, you may hear -- I'm not sure -- from one of the
10 women who were found in the apartment. Then you're going to
11 hear from a man named David Parker, sort of a sad character.
12 David Parker was the actual person who rented that apartment.
13 He wasn't there the night of the search warrant. He's in his
14 40s. He's unemployed. He's living on Social Security. He
15 believes he has a conviction for domestic battery, but he's
16 not sure. He rented that apartment, as I said.
17        He has also used crack cocaine before. He's kind
18 of proud, though; so he may or may not admit to you that he's
19 a crack addict. But he'll at least, I think, go so far as to
20 tell you that, yeah, he uses crack fairly frequently. He
21 might not be -- he might be too proud to call himself a crack
22 addict.
23        He'll tell you that he met the defendant who he
24 knows as "00." You'll hear the defendant's street names. The
25 defendant's street names are 007 and Teflon, or Tef. They

will tell you he met -- David Parker will tell you he met 00 a few months before. They struck up a friendship, a relationship, and eventually the defendant moved in and started staying at that apartment, David Parker's apartment. The defendant would pay Parker for using the apartment with a little bit of cash or with crack, which Parker would usually smoke.

He'll also tell you that it was either the night before the search warrant or maybe two nights before the search warrant -- he's not really sure -- that he was there when the defendant, using a Pyrex bowl, mixed up some crack right there in the kitchen of the apartment.

All right. What other evidence are you going to hear?

Next, you're going to hear from an Illinois State Police forensic chemist named Amy Parker, no relation to David Parker. Amy Parker will come in here, and she'll tell you she's a forensic chemist with the Illinois State Police who specializes in analyzing drugs. And she analyzed the crack; and it is, in fact, crack. Or she'll call it scientifically "cocaine base." And it weighs over 50 grams. In fact, it weighs 56 grams. So it's crack of 56 grams. She's more or less a technical witness.

Then you're going to hear from another Illinois State Police lab expert, a man named Gary Havey. Gary Havey

is a fingerprint expert. He'll tell you about examining the plastic bags that contained the crack cocaine found in the defendant's hair gel jar. He'll tell you, not surprisingly, that there were no fingerprints found that were suitable for comparison.

Now, ladies and gentlemen, the reason he's called to tell you "I didn't find anything" is simply this. This is not a movie. This is not a TV show. This isn't "CSI-Decatur." This is reality. It's not some nifty show where in an hour you wrap it up with magical DNA.

In reality, you'll learn that most of the time: DNA, nothing. Most of the time when people touch surfaces they don't leave fingerprints that are suitable for comparison. You can leave a print, a smudge, a partial, but nothing suitable to compare. That doesn't mean things magically appear. It just means if you check there's no fingerprints you can compare it to.

Lastly, you're going to hear from FBI Special Agent Jeff Warren. He'll tell you that he accompanied Detective Root on that lengthy interview with the defendant on February 2nd, several weeks after his arrest, the defendant's arrest.

He'll tell you when they sat down and talked to the defendant, the defendant told them all sorts of things, basically confessed. The defendant told them he came to Decatur in late spring or summer of 2006. The defendant told

1  them he was a barber. He cut hair. He used gels. He was
2  cutting hair at a couple places, including a place on West
3  Grand Street and at 837 East Johns, the apartment.
4        He told the agents that sometime in the summer of
5  2006 he met a man named Magic; goes by the street name Magic,
6  just like the defendant's 007 or Teflon. He met -- the
7  defendant said, "I met this guy, Magic." He met him when he
8  was cutting Magic's hair. Magic paid the defendant for those
9  haircuts with crack, which the defendant would then turn
10 around and resell for additional money. After this happened
11 for a while, Magic even fronted -- that is, gave on
12 consignment -- crack to the defendant to sell.
13       The defendant explained that, how he met David
14 Parker. He began to cut hair and sell crack out of David
15 Parker's apartment. He admitted all of that. "Yeah. I was
16 cutting hair and selling crack out of that apartment."
17       And finally, ladies and gentlemen, when Detective
18 Root and Agent Warren asked him about the 56 grams of crack
19 found in his, his gel jar, the hair gel jar found next to his
20 Bible, he said, "Yeah. You know, that crack came from Magic.
21 He brought it by for me. It's not my crack. It's Magic's
22 crack. I was holding it for him. Magic left it with me. I
23 don't know the exact weight; but, yeah, if a customer would
24 have come by, I would have sold it."
25       Ladies and gentlemen, that's possession with the

```
 1   intent to distribute.  That, ladies and gentlemen, is what
 2   the government expects the evidence to be.
 3           So with all that evidence, why are we here?  Well,
 4   we're here because under the Constitution and the laws of the
 5   United States, every defendant accused of a crime has the
 6   right to a trial.  Every defendant has the right to be
 7   represented by an attorney.  And in this case, Mr. Veals is
 8   represented by a very good attorney, my good friend, John
 9   Taylor, and Mr. Zukosky.
10           But, ladies and gentlemen, what Mr. Taylor says and
11   what I say is not evidence.  As the judge instructed you, the
12   evidence is what comes from the sworn statements of the
13   witness, the exhibits we're going to introduce into evidence,
14   and any stipulations or agreements between the parties.
15           And once you hear that testimony, hear that
16   evidence, and see those exhibits, when you apply the law the
17   judge will instruct you to use, you will see that there is
18   only one proper verdict, one correct verdict in this case; and
19   that is guilty beyond a reasonable doubt.
20           Thank you for your time.
21           THE COURT:  Thank you, Mr. Bruce.
22           Mr. Taylor, you may now address the jury on behalf
23   of Jabari Veals.
24           MR. TAYLOR:  Thank you, Your Honor.
25           May it please the Court.
```

1   THE COURT: Mr. Taylor.

2   MR. TAYLOR: Mr. Bruce.

3   MR. BRUCE: Mr. Taylor.

4   MR. TAYLOR: After that very convincing and accurate statement by my good friend, Mr. Bruce, I asked myself the same question that Mr. Bruce asked you: Why are we here?

So many answers: a confession, drug dealers in an apartment, Jabari jumping 30 foot from a second-story window in the face of police officers with a search warrant, David Parker saying that Jabari had cooked up crack in the apartment, a Bible right next to a jar containing crack cocaine. Why? Why are we here? So many answers. So many answers.

It reminds me of -- there are four, maybe five, Batman movies, you'll remember. And I believe in the third, the third movie, Batman's long-time enemy is foiled, if you would, has been again defeated by the masked avenger. And as he escapes from the castle in which he was vanquished by Batman, he's riding down this slide, the Joker riding down the slide; and he says what I consider to be the most profound statement I've ever heard anywhere. He says, "So many answers. So few questions."

And that's what comes to mind as I respond to my colleague's statement.

1          Well, what questions?  What questions would one
2   reasonably ask with such a barrage of convincing statements
3   from Mr. Bruce?  And I would tell you:  Among many duties that
4   Judge McCuskey assigns to you as jurors in this case, one will
5   be to ask questions.  Ask questions of the obvious, for it is
6   the obvious in life that is many times the most misleading.
7          For instance, what other reasons could there be for
8   a young man to jump 30 foot -- that's a long ways -- onto a
9   concrete pavement in the face of a search warrant and
10  announce, which Mr. Bruce exhibited for you very accurately?
11  That's exactly what the evidence will be, what Mr. Bruce said
12  as to the police.
13         Well, why else would he do that?  Well, he's got to
14  be guilty.  He's got to be selling crack out of that
15  apartment.  You think about it when you hear the witnesses.
16  Think -- ask yourself:  Well, that's an answer.  That's the
17  obvious answer.  Might there be other answers?  Think about
18  that.
19         One that I find particularly ironic is a drug
20  dealer dealing 5600 bags of crack cocaine has his Bible right
21  there by.  Drug dealer with a Bible?  With $2 bills?  Not $100
22  bills, not $20 bills, what we might find of a drug trafficker.
23  He's got his name written on these $2 bills.  What drug dealer
24  of that amount, $5600, carries around a Bible with $2 bills?
25  Another why, another question I would like you to ask

1  yourselves.
2      Another question came to mind. Mr. Bruce says that
3  the evidence will be -- and he's exactly right -- that my
4  client was sleeping or staying on a mattress on the floor in
5  the living room of a two- or three-room apartment, living out
6  of what some of us might have used to call a flophouse. A
7  drug dealer selling $5600 of crack cocaine living like a
8  vagabond? You saw the shelf with the shaving cream and the
9  toothbrush and the toothpaste. A drug dealer sleeping on a
10 mattress in the apartment of a guy who's a little more than a
11 crack addict who's barely getting by?
12     And then the other question I'd like you to ask
13 why, if you would please: Why is a drug dealer who's moving
14 $5600 of drugs making a living cutting hair as a barber?
15 What's that all about? What's that all about?
16     And the last question I would ask that you ask why:
17 Why? $5600 of crack cocaine, the statement, "It's not mine.
18 It's his." You would think someone would know whether or not
19 $5600 of crack cocaine is yours. That's a question for you.
20 That's a question.
21     But having said all that, I'm going to request of
22 you the only thing that Jabari and I can ask of you, the only
23 thing we will ask of you. Keep an open mind. Let the
24 evidence come in.
25     Only after you hear all the evidence. Only after

1  you ask the questions of yourselves collectively that you
2  believe need to be answered for the government to succeed on
3  their case beyond a reasonable doubt, only then collectively
4  begin to deliberate and determine your verdict.
5          Thank you, Your Honor.
6          THE COURT: Thank you, Mr. Taylor.
7          Ladies and gentlemen of the jury, we're going to
8  let you go for today with the admonition that you'll hear
9  again, and that is: Do not discuss the case with each other
10 or anyone else. Do not do any independent research whatsoever
11 of any of the issues in this case.
12         You may tell your family, friends, employer you're
13 on federal jury duty tomorrow and the next day. Don't tell
14 them anything about the case or discuss it with them.
15         Come back here any time after 8:00. The
16 courtroom -- courthouse is open after 8:00. Jury deliberation
17 room will be available to you, as well as the refrigerator if
18 you bring any personal items that you want or if you want to
19 have lunch here rather than going out. We'll start promptly
20 at 9:00. We'll probably take one break in the morning, 15 or
21 20 minutes, go till noon. Give you an hour at least for lunch
22 and then -- maybe an hour and 15, depending. I've got to look
23 at my schedule to see if I've got a luncheon meeting. Then
24 we'll go until 5:00 tomorrow.
25         Thank you very much for your service on a long day.

```
 1    We'll see you back tomorrow.  Bye now.
 2                    (Jury dismissed for the day, 4:07 p.m.)
 3              THE COURT:  You may be seated.
 4              We'll want everybody here in the courtroom at
 5    approximately 8:50 so we can be ready to bring the jury in as
 6    promptly as all of them are available so that we can go at
 7    9:00.
 8              Anything further, Mr. Bruce?
 9              MR. BRUCE:  No, thank you, Your Honor.
10              THE COURT:  Do you know who your first witness is
11    going to be?
12              MR. BRUCE:  I can give you my whole witness order
13    if you want.
14              THE COURT:  Yes.  Let's do that.
15              MR. BRUCE:  First is Officer Ed Hurst.
16              THE COURT:  Okay.
17              MR. BRUCE:  Second is Sergeant Rick McElroy.
18              Third is Detective Root.
19              Fourth would be if Toniette Bond honors the
20    subpoena she's been served.  She'd be next.
21              Same with Shannon Coefield.  I'm not optimistic,
22    Your Honor.
23              THE COURT:  Is that one where you're going to want
24    me to issue an order to the marshal if they're not here in the
25    morning to have them taken into custody and brought here in
```

1    the afternoon?
2             MR. BRUCE:  Could be.  I'm not sure they could find
3    them.  Detective Root and his guys haven't found them yet, and
4    they know Decatur very well.
5             THE COURT:  Okay.
6             MR. BRUCE:  So we'll see what happens.
7             Then it would be David Parker after that.
8             THE COURT:  But they were served with a subpoena?
9             MR. BRUCE:  Detective Root served both of them.
10            THE COURT:  Okay.
11            MR. BRUCE:  Then David Parker and then Amy Parker
12   from the State Police lab and then Gary Havey from the State
13   Police Lab and, lastly, Jeff Warren.
14            THE COURT:  Okay.  And you expect that this will go
15   into the afternoon even if the two women are not here?
16            MR. BRUCE:  Yeah.  I think between -- the first two
17   witnesses I don't think are going to take more than 15, 20
18   minutes.  Detective Root will take up probably about an hour.
19   David Parker will probably take about a half hour.  So with
20   the breaks.  That will probably take somewhere up to lunch.
21   The chemists are going to be -- State Police people are going
22   to be here at noon.  So we'll be ready to go after lunch then.
23            THE COURT:  So the defense will be on notice for
24   the afternoon.
25            We'll have everybody here at 8:50, first witness

1   ready to go at 9:00.
2           Anything further, Mr. Taylor?
3           MR. TAYLOR: No, thank you, Your Honor.
4           THE COURT: Okay. We'll be in recess till 8:50.
5           (Trial adjourned, 4:10 p.m.)

7           * * * * * * * * * * * *

9           REPORTER'S CERTIFICATE
10          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify
11  that the foregoing is a correct transcript from the record of
12  proceedings in the above-entitled matter.
13          Dated this 31st day of March, 2008.

16                      s/Lisa Knight Cosimini
                    Lisa Knight Cosimini, RMR-CRR
17                  Illinois License # 084-002998